**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

JAMES SEELY

Plaintiff,

v.

GUILD MORTGAGE CO., LLC

Defendant.

Case No. ______________

## COMPLAINT

Plaintiff James Seely ("Mr. Seely" or "Plaintiff"), by and through undersigned counsel, alleges the following as and for his Complaint against Defendant Guild Mortgage Co., LLC ("Guild" or "Defendant"):

## SUMMARY

1. This employment dispute arises out of Guild's transparent, unlawful attempt to avoid paying Mr. Seely, a now former Guild executive, compensation that he is clearly owed in the amount of at least $750,000.00. Specifically, on November 20, 2023, Guild terminated Mr. Seely's written Employment Agreement (the "Employment Agreement," a copy of which is annexed hereto as Exhibit A) purportedly for "Cause," manufacturing out of whole cloth spurious claims of Mr. Seely "not working full time." Mr. Seely has employed hundreds and hundreds of people in this state (and others) over his three plus decades of successfully owning or operating real estate and residential mortgage businesses. Indeed, Guild and Mr. Seely entered into the Employment Agreement as part of Guild in 2021 acquiring Residential Mortgage Services Holdings, Inc. ("RMS"), of which Mr. Seely was the President and CEO, for close to $200,000,000.00. Guild's motives in refusing to pay Mr. Seely's owed compensation are obvious – Guild acquired RMS at the height of the residential mortgage business boom and is now, by any

means necessary, attempting to (unlawfully) cut costs. Knowing full well that Mr. Seely performed all his obligations under the Employment Agreement, Guild fabricated claims of material breaches of the Employment Agreement to avoid clear and unequivocal contractual obligations. In fact, Mr. Seely has first-hand experience of seeing Guild try to follow the same exact playbook it is attempting here, i.e., manufacture a Cause termination to avoid paying an executive owed compensation, namely severance pay. Worse, prior to Mr. Seely's improper employment termination, Guild offered Mr. Seely's position, i.e., while Mr. Seely was still employed, to the protégé of Mr. Seely. And adding insult to injury, Mr. Seely's illegitimate employment termination followed a zoom meeting with Guild leadership in which Guild improperly tried to force and pressure Mr. Seely to resign so that he would forfeit due and owed compensation under the Employment Agreement. In short, the fact of the matter is there was no Cause to terminate the Employment Agreement. Accordingly, Mr. Seely's unlawful employment termination results in him being owed at least $750,000.00: (1) $500,000.00 in severance pay and (2) $250,000.00 in a guaranteed bonus.

2. The above actions, among others, have harmed Mr. Seely substantially, for which Guild is directly and proximately liable.

## PARTIES

3. Plaintiff James Seely is a resident of the State of New Hampshire, residing at 525 Ponemah Hill Road, Milford, New Hampshire 03055.

4. Defendant Guild is a limited liability company formed in California, with a principal place of business in San Diego, California. Upon information and belief, the members of Defendant currently reside in: San Diego, California, Bellevue, Washington, and Omaha, Nebraska.

## JURISDICTION

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs, and the parties, including Defendant's members, are citizens of different states.

6. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business and has minimum contacts with the State of Maine, including from its office where Mr. Seely worked, located at 24 Christopher Toppi Drive, South Portland, ME 04106, and the parties agreed to the exclusive personal jurisdiction of any state or federal court sitting in the State of Maine in any action or proceeding arising out of the Employment Agreement.

## FACTS

### A. Mr. Seely's Employment Agreement

7. RMS, headquartered in South Portland, ME, was founded in 1991.

8. In 2020, RMS originated $8.5 billion of mortgages according to Inside Mortgage Finance.

9. In 2021, Guild acquired RMS through a merger for close to $200 million.

10. At the time of the merger, RMS had over 70 offices across 14 states, and over 850 employees companywide, including approximately 250 loan officers.

11. The acquisition of RMS gave Guild a substantial foothold in the Northeast, providing Guild with immediate access to valuable new geographies and a strong baseline from which Guild could grow its brand. "We have a history of growing through targeted acquisitions, and the transaction with RMS supports our strategy to expand into the Northeast," and "[w]e expect the combination will result in an even stronger platform that will continue to deliver profitable

sustained growth, as we create long-term value for all our stakeholders," said Mary Ann McGarry, former Chief Executive Officer of Guild.

12. The acquisition of RMS also positioned Guild to continue generating durable volume and margins.

13. The RMS management team, including its President and CEO – Mr. Seely – averaged more than 30 years of industry experience.

14. Due to Mr. Seely's significant experience and success in the residential mortgage industry, including at RMS, Guild desired to retain Mr. Seely as an employee, and hired him on or about May 10, 2021, pursuant to the Employment Agreement, as Guild's Division Vice President of its Northeast region. Mr. Seely remained in this position until he was wrongfully terminated on November 20, 2023.

15. Pursuant to the Employment Agreement, Guild tasked Mr. Seely with the duties of managing and overseeing the now-acquired RMS branches and Guild's Northeast operations.

16. The Employment Agreement provided Mr. Seely with a five-year term of employment (the "Employment Period"), subject to termination provisions providing for severance in the event he was terminated without Cause or for Good Reason. In the event Guild terminated Mr. Seely prior to the conclusion of the Employment Period without Cause, Guild would be obligated to pay Mr. Seely severance equal to one year's base salary. At all relevant times, Mr. Seely's base salary was five-hundred thousand dollars ($500,000.00) per year, less applicable withholdings.

17. In addition to his base salary, the Employment Agreement provided for Mr. Seely to receive a performance bonus targeted at the full amount of that year's base salary with a minimum amount of two-hundred and fifty thousand dollars ($250,000.00) for calendar years

2021, 2022 and 2023 (the "Bonus"). Specifically, the Employment Agreement provided that, the "annual bonus for calendar years 2021, 2022, and 2023 *shall be* no less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), less applicable withholdings." (Employment Agreement, Section 3(b)) (emphasis added).

18. The Employment Agreement also provided Mr. Seely "shall be reimbursed … for all reasonable out-of-pocket business expenses incurred and paid by [Mr. Seely] during the Employment Period] and in connection with the performance of [his] duties." (Employment Agreement, Section 3(e)).

19. In the event Guild terminated Mr. Seely for Cause, Guild would not be obligated to pay Mr. Seely severance compensation.

20. The Employment Agreement specifically outlined the terms under which the Employment Period could be terminated prior to the conclusion of its five-year term. "Cause" under the Employment Agreement is defined to mean:

> a. Commission of an act of intentional dishonesty concerning a material matter by Employee against or with respect to Company or its affiliates;
>
> b. A breach of any fiduciary duty owed by [Mr. Seely] to Company or its affiliates;
>
> c. A material breach by [Mr. Seely] of the terms of th[e] [Employment] Agreement or any other agreements relating to Company by which Employee is bound, which is not cured, if capable of being cured, within thirty (30) days following written notification to Employee of such material breach;
>
> d. The commission by [Mr. Seely] of an act of embezzlement, fraud, larceny or theft;
>
> e. The continuing or repeated failure or refusal by Employee to follow the lawful and reasonable directives of [Mr. Seely's] superiors or to perform [Mr. Seely's] duties as an employee of Company, which is not cured, if capable of being cured, within thirty (30) days

following written notification to [Mr. Seely] of such failure or refusal;

f. Willful misconduct or gross negligence of [Mr. Seely] in connection with the performance of [Mr. Seely's] duties as an employee of the Company;

g. Any failure by [Mr. Seely] to devote substantially all of [Mr. Seely's] working time during normal business hours to the business affairs of Company (as provided in Section 2 [of the Employment Agreement] and which is not cured, if capable of being cured, within thirty (30) days following written notification to [Mr. Seely] of such failure;

h. The commission by [Mr. Seely] of any acts of moral turpitude which could reasonably be expected to have a material adverse effect on the goodwill of the business of Company or any of its affiliates; or

i. The conviction of [Mr. Seely] of a felony.

(Employment Agreement, Section 4(a)). Other than these provisions, there was no basis upon which Guild could terminate Mr. Seely for "Cause."

**B. Mr. Seely Fully Performed His Duties as Division Vice President**

21. During his employment, Mr. Seely fully and faithfully performed all his obligations under the Employment Agreement. Mr. Seely devoted substantially all his attention and energies on a full-time basis to Guild and was continuously in contact with both his direct reports and key employees.

22. As a direct result of Mr. Seely's stewardship, Mr. Seely's division has a number of Guild's top performing salespeople, including his protégé, who Guild has selected to replace Mr. Seely.

23. Mr. Seely also regularly assisted Guild with the recruitment of key personnel, as well as assisted with executive separations to ensure the Northeast division continued to perform at a high level.

24. Despite the recent cratering of the residential mortgage business, of which Mr. Seely is not to blame, Mr. Seely's work performance was continuously applauded, as shown most clearly with Mr. Seely being referred to, within Guild, as "Barry 2.0" – a reference to a well-respected, but now retired Guild sales manager, Barry Horn.

25. In addition to his duties as Division Vice President, Guild directed Mr. Seely to leverage his extensive relationships to negotiate and retain certain key employees who had left Guild's employ or had indicated their intent to leave Guild's employ during the recent real estate mortgage industry boom.

### C. Guild Attempted to Force Mr. Seely to Resign and When Such Action Failed, Guild Attempted to Create "Cause" to Terminate the Employment Agreement

26. Over time, following the merger, the residential mortgage business, as a whole, began to cool. To cut costs, Guild – with Mr. Seely's direct assistance – began terminating the employment of several employees.

27. Despite Mr. Seely assisting in these sensitive employment terminations, Guild set its sight on (wrongfully) terminating Mr. Seely's Employment Agreement.

28. The morning of October 17, 2023, Mr. Seely learned that his role as Division Vice President had been offered to Bob Johnson, another executive employee at Guild (and former RMS executive). Mr. Seely trained Mr. Johnson, and has worked closely with him, for years. For the avoidance of doubt, Guild offered Mr. Johnson to take Mr. Seely's position while Mr. Seely was *still* employed pursuant to the Employment Agreement.

29. Subsequently, on the afternoon of October 17, 2023, Terry Schmidt, the CEO of Guild ("Ms. Schmidt"), met with Mr. Seely and pressured him to resign from his role as Division Vice President, threatening Mr. Seely by claiming his reputation in the market would be severely damaged if Mr. Seely did not resign and Guild terminated his employment. As Guild and Ms.

Schmidt are aware, pursuant to the Employment Agreement, in the event Mr. Seely resigned without "Good Reason," Mr. Seely would not be entitled to any severance compensation.

30. Despite Ms. Schmidt's wildly improper conduct, Mr. Seely refused to resign.

31. After failing to force Mr. Seely to resign from his position, on October 20, 2023, Guild provided Mr. Seely with a letter (the "Letter," a copy of which is annexed hereto as Exhibit B) falsely claiming that "Cause" for termination existed under the Employment Agreement because:

a. Guild's Northeast Region was not profitable and had underperformed (1) "as it relate[d] to efficiency metrics in all fulfillment categories," (2) with respect to "lost market share," and (3) as compared to other Guild regions;

b. Mr. Seely was not engaged "full-time" according to the "number of times [he] log[ed] into Guild's system" and he did not "consistently attend meetings;"

c. Mr. Seely breached a non-descriptive "fiduciary duty" seven-months earlier by sharing a text message communication from Ms. Schmidt with another Guild employee.

32. The Letter further stated that Mr. Seely had thirty (30) days to "cure" these items.

33. No cited item had to be cured.

34. Specifically, the Letter instructed Mr. Seely to "devote [his] full-time effort to lead and manage the Northeast division (i.e., at least 40 hours per week) (emphasis in original), [a]ttend all meetings and events related to the management of the Northeast division, [g]row market share by recruiting and retaining the salesforce in the Northeast division, [r]un the division at a break-even or better, [u]phold and support Guild's culture and values[,]" and required Mr. Seely to obtain

prior written approval from certain Guild representatives to hire or otherwise recruit Guild employees. (Letter, page 3).

35. Despite the Letter alleging "Cause" under the Employment Agreement could be triggered by division or company-wide financial performance, that is not the case. There is nothing within the Employment Agreement requiring Mr. Seely to meet certain profitability or efficiency metrics or outperform other Guild company regions to avoid a "Cause" termination.

36. In any event, as Guild knows all too well, Mr. Seely's Northeast division has a number of Guild's top performing salespeople, and further, the Northeast division is not, and was not during Mr. Seely's tenure, Guild's worst performing division or region.

37. In short, the Northeast division performed well relative to other Guild divisions and further, any performance decline was not the result of Mr. Seely's work performance but instead the result of significant industry-wide changes for the worse in the market.

38. In 2022, Guild reported a $58.3 million net income from April to June, a 72% decrease from $208 million in the first quarter. Virtually all mortgage lenders, including Guild, posted significant decreases in profits in the second quarter of 2022, owing to a sharp increase in mortgage rates and challenges in the secondary market.

39. "We have realized approximately $40 million of annualized expense savings through the first half of the year, which is primarily the result of staff reductions and their associated total compensations," Amber Kramer, Guild's Chief Financial Officer, said in August 2022.

40. Indeed, in March 2023, Guild reported its first quarterly loss since going public, with its leadership recognizing that the mortgage industry turbulence had left its mark on the company. Guild had a net loss of $32.8 million with its origination business in Q1 2023, up from

a net loss of $26.6 million in the prior quarter. Guild also had a loss of $300,000.00 with its servicing portfolio compared to a $21.5 million net income in the previous quarter.

41. Moreover, there is no basis whatsoever to conclude that Mr. Seely did not work full time for Guild. Mr. Seely was always available and was always working when needed to fulfill his job duties, most notably through a multitude of calls and communications throughout business days with both his direct reports and key employees. Further, Mr. Seely was regularly involved in recruiting new personnel.

42. Guild's assertion that Mr. Seely breached an undefined fiduciary duty by sharing a text message that was neither marked confidential nor private, and contained no proprietary information, is absurd. As Guild knows, Mr. Seely shared the referenced text message while assisting Guild in its separation communications and negotiations with a Guild executive. To be clear, Mr. Seely was, at Guild's direction, helping Guild with this executive separation.

**D. Despite its demand that Mr. Seely "Cure" Alleged "Attendance and Neglect of Duties," Guild Diminished Mr. Seely's Role and Prevented Him from Attending Meetings**

43. In a direct effort to prevent Mr. Seely from "curing" his alleged "attendance and neglect of [his] duties," Guild literally and figuratively, "froze" Mr. Seely out of meetings. For example, after the sending of the Letter, multiple meetings took place in both Massachusetts and Pennsylvania that Mr. Seely should have attended as the Division Vice President. Mr. Seely was never invited, and Mr. Seely's communications requesting to attend those meetings, and other meetings to perform his duties, went unanswered by Guild.

44. On November 10, 2023, Mr. Seely, after becoming aware of these circumstances that resulted in a diminution of his duties, provided Guild with written notice regarding its obligation to cure such diminishment (the "Response Letter," a copy of which is annexed hereto as Exhibit C). Guild had 30 days after Mr. Seely's notice (i.e., until December 10, 2020) to cure

the issues. If left uncured, Guild's misconduct allowed Mr. Seely to resign with "Good Reason" under the Employment Agreement. Through the Response Letter, Mr. Seely also responded to the claimed "Cause" triggers that Guild articulated in the Letter.

45. Guild did not respond to Mr. Seely's Response Letter and did not cure the diminishment of Mr. Seely's duties as required under the Employment Agreement, and further, Guild continued to exclude Mr. Seely from meetings.

**E. Guild's Wrongful Termination of Mr. Seely**

46. On November 20, 2023, Guild provided Mr. Seely with written notice of termination of the Employment Agreement purportedly for Cause (the "Notice," a copy of which is annexed hereto as Exhibit D).

47. The Notice stated that Mr. Seely had failed to "cure" the alleged breaches set forth in the Letter, specifically "fail[ing] to devote [his] full time and attention to the performance of [his] job duties," and "demonstrating a lack of intent to cure." (Notice, page 1).

48. The Notice further provided that because of Mr. Seely's purported failure to "cure," Guild was terminating him with Cause, effective immediately.

49. The Notice was wrong. There was no Cause to terminate the Employment Agreement.

50. Mr. Seely was not provided severance compensation or any of his guaranteed 2023 Bonus.

**COUNT I**

**(Breach of Contract)**

51. Plaintiff incorporates, by reference, each and every allegation of paragraphs 1 through 50 above, as if fully restated herein.

52. The Employment Agreement is a valid and binding agreement between Guild and Mr. Seely.

53. Mr. Seely fully performed all of his obligations under the Employment Agreement.

54. Guild failed to comply with the provisions of the Employment Agreement necessary to effectuate a termination for Cause. Instead, Guild terminated the Employment Agreement without Cause.

55. In the event Guild terminated Mr. Seely prior to the conclusion of the Employment Period without Cause, Guild would be obligated to pay Mr. Seely severance equal to one year's base salary based on his then current base salary.

56. The Employment Agreement also guarantees a Bonus in 2023 of "no less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), less applicable withholdings." (Employment Agreement, Section 3(b)).

57. Guild breached the Employment Agreement, giving Mr. Seely an immediate right to severance compensation, the 2023 Bonus, and other benefits.

58. Mr. Seely has been damaged because of Guild's breach of the Employment Agreement in an amount to be determined at trial, but no less than (i) his base salary for a period of one year (i.e., $500,000.00), (ii) the guaranteed amount of the Bonus (i.e., $250,000.00); and (iii) such other damages as he proves at trial.

**COUNT II**

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

59. Plaintiff incorporates, by reference, each and every allegation of paragraphs 1 through 58 above, as if fully restated herein.

60. Implied in employment agreements with a definitive term is an implied covenant of good faith and fair dealing.

61. The Employment Agreement between Guild and Mr. Seely provided a definitive five-year term of employment unless Mr. Seely was terminated prior to the Employment Period only for the reasons specified therein and subject to certain severance provisions.

62. Guild violated the implied covenant of good faith and fair dealing by, among other conduct, falsely claiming that “Cause” exists under the Employment Agreement in an attempt to avoid paying both the severance compensation and Mr. Seely’s guaranteed Bonus for 2023; intentionally disregarding the contractually agreed upon severance compensation owed to Mr. Seely; offering Mr. Seely’s role to another employee while Mr. Seely was still employed; actively excluding Mr. Seely from meetings and discussions and thereby preventing Mr. Seely from “curing” items flagged within the Letter; and ignoring Mr. Seely’s requests to be invited to and gain access to Guild meetings that he should have attended as Division Vice President.

63. As a result of these breaches of the covenant of good faith and fair dealing, Mr. Seely has suffered and will continue to suffer, harm and other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Seely respectfully requests that this Court enter judgment in his favor and against Defendant Guild as follows:

a) Award Mr. Seely the severance compensation in the amount of $500,000.00, owed to Mr. Seely under the terms of the Employment Agreement;

b) Award Mr. Seely his 2023 Bonus in the amount of $250,000.00, owed to Mr. Seely under the terms of the Employment Agreement;

c) Enter a declaratory judgment that Guild's material breach of the Employment Agreement excuses Mr. Seely's performance under the Employment Agreement, namely adherence to the purported restrictive covenants; and

d) Award any other relief the Court deems just and appropriate.

Respectfully submitted,

JAMES SEELY

By his attorney,

***/p/ Timothy McKeon___________***
Timothy McKeon (No. 005379)
Brendan Lowd (*pro hac vice to be filed*)
Delaney Busch (*pro hac vice to be filed*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
Fax: (617) 542-2241
tjmckeon@mintz.com
bjlowd@mintz.com
dmbusch@mintz.com

Dated: February 2, 2024

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues for which trial by jury is permitted by law.

Respectfully submitted,

JAMES SEELY

By his attorney,

***/p/ Timothy McKeon*___________**

Timothy McKeon (No. 005379)
Brendan Lowd (*pro hac vice to be filed*)
Delaney Busch (*pro hac vice to be filed*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
Fax: (617) 542-2241
tjmckeon@mintz.com
bjlowd@mintz.com
dmbusch@mintz.com

Dated: February 2, 2024